SOVEREIGN BANK, Appellant

v.

John G. VALENTINO and Jeffrey Ganter, Appellees.

Sovereign Bank, Appellee

v.

John Valentino and Jeffrey Ganter

Appeal of Jeffrey Ganter, Appellant.

Superior Court of Pennsylvania.

Argued Jan. 10, 2006.
Filed Nov. 27, 2006.
Reargument Denied Feb. 5, 2007.

Brett A. Datto, Philadelphia, for Sovereign Bank.

Jeffrey Ganter, Pro Se.

BEFORE: LALLY–GREEN, GANTMAN, and KELLY, JJ.

OPINION BY GANTMAN, J.:

¶ 1 The parties, Sovereign Bank ("Sovereign") and Jeffrey Ganter, ask us to determine whether the trial court erred when it entered judgment in favor of Sovereign in the amount of $143,000.00, based upon a claim of concerted tortious action. We hold the trial court erred when it did not enter judgment in favor of Sovereign for $303,323.90, the entire harm caused by Mr. Ganter's tortious conduct, where concerted tortious action, as set forth in Section 876 of the Restatement (Second) of Torts, is a recognized civil cause of action under Pennsylvania law. We further hold Mr. Ganter's arguments related to the statute of limitations and the Commercial Code are waived. Accordingly, we vacate the judgment and remand for the entry of a damage award consistent with this opinion.

¶ 2 The relevant facts and procedural history of these appeals are as follows. On July 2, 2001, Sovereign filed a complaint against its former employee, John Valentino.[1] Sovereign alleged Mr. Valentino used his position as a commercial loan officer to establish loan accounts under fictitious names and deposit the loan proceeds into

---

1. John Valentino is not a party to the instant appeals.

checking accounts bearing the same fictitious names. Sovereign further alleged Mr. Valentino dissipated these accounts for his own use and benefit. Between 1995 and 2000, Mr. Valentino diverted approximately $1,821,565.74 in loan proceeds.

¶ 3 On October 17, 2002, Sovereign filed a motion for leave of court to file an amended complaint, which the court granted. Sovereign filed its amended complaint on December 13, 2002, adding Mr. Ganter. Sovereign alleged Mr. Ganter, who had worked in the banking industry since 1973, knowingly assisted Mr. Valentino in misappropriating the loan proceeds.[2]

¶ 4 Sovereign contended Mr. Valentino met with Mr. Ganter on multiple occasions between 1995 and 2000, for the purpose of providing Mr. Ganter with checks drawn from the fraudulent checking accounts. The checks were written for amounts between $10,000.00 and $40,000.00. In exchange, Mr. Ganter gave Mr. Valentino checks drawn from Mr. Ganter's personal bank accounts, in amounts less than the checks issued from the fraudulent accounts. Sovereign alleged Mr. Valentino used Mr. Ganter in this way to "launder" the proceeds of the fraudulent loan accounts. Sovereign also estimated Mr. Valentino misappropriated $1,821,565.74 of bank funds.

¶ 5 Sovereign alleged one count of aiding and abetting against Mr. Ganter, claiming he "actively, knowingly, and intentionally facilitated Mr. Valentino's fraudulent scheme by knowingly exchanging funds for the proceeds of such scheme and depositing proceeds of such scheme into his personal accounts." (Amended Complaint, filed 12/13/02, at ¶ 72; R.R. at 133a–134a). Sovereign further claimed it suffered damages as a direct result of Mr. Ganter's actions, and it demanded judgment against Mr. Ganter in the amount of $1,821,565.74, plus interest, punitive damages, attorneys' fees and costs. Additionally, Sovereign alleged counts against Mr. Ganter under theories of conversion, fraud, unjust enrichment, and conspiracy.

¶ 6 Sovereign filed a motion for summary judgment against Mr. Valentino on March 20, 2003. On July 3, 2003, Mr. Valentino pled guilty in federal court to related bank fraud charges. Subsequently, Sovereign filed a supplemental motion for summary judgment against Mr. Valentino, which the court granted on December 17, 2003.

¶ 7 At the same time, Mr. Ganter chose to proceed *pro se* and responded to Sovereign's allegations against him. On January 16, 2003, Mr. Ganter filed an answer to Sovereign's complaint, as well as what he called a petition to dismiss the amended complaint. Mr. Ganter's answer denied the averments contained in Sovereign's pleading; his petition to dismiss alleged defects in Sovereign's pleading, as well as defects in service of the pleading.[3] On March 5, 2003, the trial court denied Mr. Ganter's petition to dismiss.

¶ 8 On September 2, 2003, Mr. Ganter filed what he called a new matter and motion to dismiss Sovereign's amended

---

2. Mr. Ganter first met Mr. Valentino in 1989, when the two worked at the East Brunswick office of First Fidelity Bank. (Sovereign's Trial Exhibit 1, N.T. Deposition of Jeffrey Ganter, 3/27/02, at 58, 61; R.R. at 598a, 601a). At that time, Mr. Ganter held the title of "assistant vice president of loan review," and Mr. Valentino was his boss. (*Id.* at 19, 58; R.R. at 559a, 598a).

3. Mr. Ganter's appellate brief mentions his argument regarding defective service, but it does not develop this claim. Therefore, Mr. Ganter has effectively abandoned this argument on appeal.

complaint. In this filing, Mr. Ganter again insisted Sovereign's pleading was defective and improperly served. Mr. Ganter also asserted Sovereign had committed numerous discovery violations. Mr. Ganter concluded the action against him should be dismissed, because of Sovereign's "failure to respond to either discovery and/or interrogatories and its false statement on record about cooperating with Ganter...." (New Matter and Motion to Dismiss, filed 9/2/03, at 4; R.R. at 403a). On December 17, 2003, the trial court denied Mr. Ganter relief. On May 21, 2004, Mr. Ganter filed a motion for hearing and sanctions, alleging violations of the Rules of Civil Procedure by Sovereign and counsel. The court also denied this motion by order entered June 28, 2004.

¶ 9 Mr. Ganter proceeded to a bench trial on July 26, 2004. At trial, Sovereign entered into evidence copies of nine checks issued by Mr. Valentino to Mr. Ganter, drawn from the fraudulent checking accounts, totaling $303,323.90. These checks are summarized in the following chart:

| Date | Check # | Amount | Fictitious Name on Checking Account | Plaintiff's Exhibit # |
|------|---------|--------|-------------------------------------|----------------------|
| 10/95 | 94 | $45,737.00 | James D. Mitchell | Ganter-2 |
| 7/25/95 | 98 | $43,000.00 | Jay T. Ganner | Ganter-4 |
| 3/12/96 | 109 | $42,000.00 | James D. Mitchell | Ganter-5 |
| 11/21/96 | 116 | $36,510.00 | James D. Mitchell | Ganter-8 |
| 1/13/97 | 117 | $15,959.00 | James D. Mitchell | Ganter-9 |
| 5/96 | 152 | $40,039.00 | Jay T. Ganner | Ganter-10 |
| 5/28/96 | 156 | $28,965.00 | Jay T. Ganner | Ganter-11 |
| 4/11/97 | 176 | $27,113.90 | Jay T. Ganner | Ganter-12 |
| 6/1/97 | 181 | $24,000.00 | Jay T. Ganner | Ganter-13 |

Sovereign also presented evidence of four checks issued by Mr. Ganter to Mr. Valentino, drawn from Mr. Ganter's personal account, totaling $135,933.10:

| Date | Check # | Amount | Plaintiff's Exhibit # |
|------|---------|--------|----------------------|
| 10/6/95 | 776 | $44,537.00 | Ganter-3 |
| 5/13/96 | 1026 | $39,384.00 | Ganter-6 |
| 5/30/96 | 1051 | $28,595.10 | Ganter-7 |
| 6/11/97 | 1595 | $23,417.00 | Ganter-14 |

¶ 10 Mr. Ganter testified in his own defense and vigorously denied participating in any money laundering scheme. Instead, Mr. Ganter testified that Mr. Valentino had asked him to join "some sort of stock club," and the checks he exchanged

with Mr. Valentino were related to costs and profits associated with this endeavor. (N.T. Trial, 7/26/04, at 93; R.R. at 1104a). On November 24, 2004, the court entered a verdict in favor of Sovereign in the amount of $143,000.00. According to the court, this figure represented the amount "by which Ganter personally profited." [4] (Trial Court Opinion, dated June 17, 2005, at 3).

 ¶ 11 Mr. Ganter timely filed a post-trial motion on December 6, 2004, asserting the verdict was "excessively punitive" and "contrary to the weight of the evidence." [5] (Motion for Post-Trial Relief, filed 12/6/04, at 2; R.R. at 1518a). On December 13, 2004, Sovereign filed a cross-motion for post-trial relief. Sovereign contended the evidence adduced at trial demonstrated Mr. Ganter "directly assisted Mr. Valentino in laundering and concealing" the sum of $328,256.90. (Cross–Motion for Post–Trial Relief, filed 12/13/04, at 3; R.R. at 1539a). Sovereign concluded the verdict should permit recovery in this amount. On February 18, 2005,

the court denied both parties' post-trial motions. Sovereign filed its notice of appeal on February 24, 2005. Mr. Ganter filed his notice of appeal on March 3, 2005. On March 10, 2005, Sovereign filed a *praecipe* for the entry of judgment in its favor, in the amount of $143,000.00.[6]

¶ 12 In its appeal, docketed at No. 499 EDA 2005, Sovereign raises three issues for our review:

SHOULD [DEFENDANT] BE LIABLE FOR THE TOTAL AMOUNT THAT HE AIDED [ANOTHER PARTY] IN FRAUDULENTLY MISAPPROPRIATING, LAUNDERING AND CONCEALING FROM [PLAINTIFF], RATHER THAN THE AMOUNT HE PERSONALLY PROFITED?

SHOULD THE TRIAL COURT HAVE GRANTED [PLAINTIFF'S] POST–TRIAL MOTION TO INCREASE THE JUDGMENT AMOUNT TO THE FULL AMOUNT [DEFENDANT] ASSISTED [ANOTHER PARTY] IN

---

4. To arrive at this figure, the court concluded Mr. Ganter received $303,323.90 in checks from Mr. Valentino. The court also found Mr. Ganter wrote five checks back to Mr. Valentino, totaling $160,331.10. This figure included the total amount of the four checks entered into evidence by Sovereign, as well as a fifth check entered into evidence by Mr. Ganter, in the amount of $24,398.00. (N.T. Trial, 7/26/04, at 110–111; R.R. at 1121a–1122a). Based on this particular evidence, the court calculated Mr. Ganter's total "amount retained" from Mr. Valentino as $142,992.80. (Trial Court Opinion at 2). The court rounded this amount to $143,000.00. (*Id.*)

5. Post-trial motions shall be filed within ten days after the entry of the verdict. Pa.R.C.P. 227.1(c). Here, the tenth day fell on December 4, 2004, a Saturday. Thus, Mr. Ganter timely filed his motion on Monday, December 6, 2004.

6. In their *notices of appeal*, the parties purport to appeal from the trial court's denial of their post-trial motions. Such orders are interlocutory and generally not appealable. *Brown v. Philadelphia College of Osteopathic Medicine,* 760 A.2d 863, 865 (Pa.Super.2000), *appeal denied,* 566 Pa. 632, 781 A.2d 137 (2001). Rather, the subsequent judgment is appealable. *Id.* A final judgment entered during the pendency of an appeal is sufficient to perfect appellate jurisdiction. *Drum v. Shaull Equipment and Supply Co.,* 787 A.2d 1050 (Pa.Super.2001), *appeal denied,* 569 Pa. 693, 803 A.2d 735 (2002). In the present action, Sovereign filed its notice of appeal on February 24, 2005. Mr. Ganter filed his notice of appeal on March 3, 2005. However, judgment on the verdict was not entered until March 10, 2005. Thus, the parties' notices of appeal relate forward to March 10, 2005, the date judgment was entered and copies of the judgment were distributed to all the appropriate parties. *See* Pa.R.A.P. 905(a) (stating notice of appeal filed after court's determination but before entry of appealable order shall be treated as filed after such entry and on date of entry).

FRAUDULENTLY MISAPPROPRI-
ATING FROM [PLAINTIFF], RATH-
ER [THAN] THE AMOUNT [DEFEN-
DANT] PERSONALLY PROFITED?
SHOULD [PLAINTIFF'S] JUDG-
MENT AMOUNT BE $328,256.90,
WHICH WAS THE AMOUNT [DE-
FENDANT] ADMITTED HE RE-
CEIVED FROM [ANOTHER PARTY],
AND NOT THE DIFFERENCE BE-
TWEEN THE AMOUNT HE RE-
CEIVED, AS DEMONSTRATED BY
COPIES OF CHECKS PRODUCED
AT TRIAL, AND WHAT HE RE-
TURNED TO [THE OTHER PARTY?]

(Sovereign's Brief at 2).

¶ 13 "Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law." *Baney v. Eoute*, 784 A.2d 132, 135 (Pa.Super.2001).

> The findings of the trial judge in a non-jury case must be given the same weight and effect on appeal as the verdict of a jury, and the findings will not be disturbed on appeal unless predicated upon errors of law or unsupported by competent evidence in the record. Furthermore, our standard of review demands that we consider the evidence in a light most favorable to the verdict winner.

*Id.* (internal citations omitted). Additionally, "the trial court, as factfinder, is free to believe all, part or none of the evidence presented...." *Turney Media Fuel, Inc. v. Toll Bros., Inc.*, 725 A.2d 836, 841 (Pa.Super.1999). "[T]herefore, assessments of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determinations or substitute our judgment for that of the factfinder." *Id.*

¶ 14 Sovereign contends Mr. Ganter received ten checks from Mr. Valentino, totaling $328,256.90. Sovereign insists Mr. Ganter is liable for $328,256.90, under a "tortious aiding and abetting" theory of liability. (Sovereign's Brief at 9). Sovereign complains the trial court erred when it declined to enter judgment against Mr. Ganter for the full $328,256.90, because the court "looked to the amount that [Mr.] Ganter benefited as the measure of damages." (*Id.* at 11). Sovereign relies on Section 876 of the Restatement (Second) of Torts for the proposition that "[t]he measure of damages ... is not the amount which the aider and abettor benefits ... but the amount of harm resulting to a third person." (*Id.*) (internal quotation marks omitted). Sovereign concludes the trial court erred when it found Mr. Ganter liable for only $143,000.00 and this Court must enter judgment in Sovereign's favor in the amount of $328,256.90.

¶ 15 Mr. Ganter responds there is no civil cause of action for the tort of civil aiding and abetting in Pennsylvania. Mr. Ganter acknowledges Section 876 describes such a claim, but he insists Pennsylvania has not adopted Section 876. Mr. Ganter also posits Sovereign did not properly plead this cause of action, and it failed to prove Mr. Ganter actually committed this tort.

¶ 16 Mr. Ganter further objects to the court's calculation of damages. Mr. Ganter asserts the trial court improperly excluded his evidence regarding six additional checks drawn from Mr. Ganter's personal account, made payable to Mr. Valentino. Mr. Ganter contends the court should have included these checks in its calculations. Mr. Ganter insists he wrote ten total checks to Mr. Valentino, totaling $321,460.67, but he only received nine checks from Mr. Valentino, totaling 303,-323.90; thus, Mr. Ganter did not realize

any "profit" from his dealings with Mr. Valentino. Instead, Mr. Ganter complains he lost $18,136.77 from his dealings with Mr. Valentino. Mr. Ganter concludes the trial court erred in its calculation of Sovereign's damages, and he asks this Court to set aside the entire verdict on this basis. We agree in part with Sovereign's claims and reject Mr. Ganter's claims.

¶ 17 Section 876 of the Restatement (Second) of Torts addresses the tort of civil aiding and abetting, which is also known as concerted tortious conduct:

### § 876. Persons Acting in Concert

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

\* \* \*

**Comment on Clause (b):**

d. Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance. **If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act.** This is true both when the act done is an intended trespass (see Illustrations 4 and 5) and when it is merely a negligent act. (See illustration 6). The rule applies whether or not the other knows his act is tortious. (See Illustrations 7 and 8). It likewise applies to a person who knowingly gives substantial aid to another who, as he knows, intends to do a tortious act.

\* \* \*

Restatement (Second) of Torts § 876 (1977) and comment on clause (b).

¶ 18 Section 876 is a "specific application" of the rule stated in Section 875. Restatement (Second) of Torts § 875 (1977), comment. Section 875 addresses the liability of contributing tortfeasors:

### § 875. Contributing Tortfeasors— General Rule

Each of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the **entire harm.**

Restatement (Second) of Torts § 875 (1977) (emphasis added).

¶ 19 This Court has addressed the applicability of Section 876 under various circumstances. *See Brandjord v. Hopper,* 455 Pa.Super. 426, 688 A.2d 721 (1997), *appeal denied,* 550 Pa. 675, 704 A.2d 633 (1997) (stating plaintiffs could not sustain cause of action for concerted tortious conduct, because liability cannot be imposed where passengers are "merely companions" who did nothing to substantially encourage or assist driver in his voluntary consumption of alcohol and operation of motor vehicle while intoxicated); *Burnside v. Abbott Laboratories,* 351 Pa.Super. 264, 505 A.2d 973 (1985) (explaining plaintiffs could not sustain cause of action for concerted tortious conduct against pharmaceutical manufacturer, because plaintiffs did not allege tacit understanding, common design to market defective product, or that

manufacturer rendered substantial assistance in causing injury); *Cummins v. Firestone Tire & Rubber Co.,* 344 Pa.Super. 9, 495 A.2d 963 (1985) (stating plaintiff could not maintain cause of action for concerted tortious conduct, because he could not identify manufacturer of tire assembly which caused his injury, and plaintiff failed to aver that manufacturer of wheel rims rendered substantial assistance to manufacturers who had allegedly engaged in concerted tortious conduct); *Kline v. Ball,* 306 Pa.Super. 284, 452 A.2d 727 (1982) (holding plaintiff could not sustain cause of action for concerted tortious conduct where evidence did not establish which student made "a dare" to knock trash can off balcony).

¶ 20 Our Supreme Court expressly adopted this Court's "interpretations" of Section 876 in *Skipworth by Williams v. Lead Industries Ass'n, Inc.,* 547 Pa. 224, 690 A.2d 169 (1997):

The concert of action theory has not yet been discussed by this [C]ourt, but has been addressed by our Superior Court. In *Burnside* and *Kline,* the Superior Court held that a claim of concerted action cannot be established if the plaintiff is unable to identify the wrongdoer or the person who acted in concert with the wrongdoer. We find that these interpretations of the concert of action theory are eminently reasonable and hereby expressly adopt them.

We find that Appellants failed to establish that they had a cause of action for concert of action as they are unable to identify the manufacturer of any of the lead pigment found at Skipworth's residence that was ingested by her and allegedly caused her injuries. As they are unable to identify any one of the lead pigment manufacturers as the wrongdoer, we therefore hold that the trial court correctly entered summary judgment on the concert of action claim. *Id.* at 236, 690 A.2d at 174–75 (internal citations omitted). In light of this language from *Skipworth,* the Commonwealth Court recently recognized concerted tortious conduct as "a viable cause of action" in *Koken v. Steinberg,* 825 A.2d 723, 731 (Pa.Cmwlth.2003), appeal quashed, 575 Pa. 103, 834 A.2d 1103 (2003).

¶ 21 Instantly, Sovereign's amended complaint included a concerted tortious conduct claim against Mr. Ganter:

10. Throughout the term of his employment, Mr. Valentino, misusing his authority and position as one of [Sovereign's] commercial loan officers, falsely and fraudulently caused [Sovereign] to advance certain loan funds in an aggregate amount of not less than $1,821,565.74 (the "Loans"), to purported individuals named Jay T. Ganner ("Ganner"), Robert Malloy ("Malloy") and James D. Mitchell ("Mitchell"). Ganner, Malloy, and Mitchell, in fact, were, and are, fictitious persons and alias names used by Mr. Valentino to perpetrate his fraudulent scheme against [Sovereign].

11. In conjunction with the making of the Loans, Mr. Valentino caused checking accounts (the "Checking Accounts") to be opened at Sovereign in the name of Ganner, Malloy, and/or Mitchell into which advances on the Loans were deposited periodically, during the course of Mr. Valentino's fraudulent scheme, by [Sovereign] who, as a result of Mr. Valentino's false representations, believed the Loans to be legitimate extensions of credit to *bona fide* persons, rather than a fraudulent scheme by Valentino to misappropriate and convert [Sovereign's] funds.

12. The false and fraudulent application prepared and submitted by Mr. Va-

lentino for the loan to Ganner ... identified Ganner's social security number ... which, in fact, is Ganter's social security number.

13. On some occasions, Mr. Valentino falsely and fraudulently affixed the purported signature of his supervisor ... to secure advances on the Loans that were already approved. [The supervisor] was unaware of the fraudulent use of his signature or Mr. Valentino's fraudulent scheme being perpetrated against [Sovereign].

14. On or about November 17, 2000, Mr. Valentino resigned his position with [Sovereign] after he was suspended for violating [Sovereign's] lending policies.

15. After Mr. Valentino's departure, [Sovereign] reviewed all of the loans in Mr. Valentino's loan portfolio. This review included contacting each borrower identified therein unless that borrower was already personally known to another of [Sovereign's] employees. Despite several attempts, [Sovereign] was unable to contact the purported individuals Ganner, Malloy and Mitchell, whereupon [Sovereign] discovered that the individuals are fictitious and the Loans are a part of a fraudulent scheme perpetrated by Mr. Valentino to misappropriate and convert [Sovereign's] monies.

\* \* \*

19. Ganter, who at one time was a bank examiner with the Federal Deposit Insurance Corporation, has more than twenty (20) years experience in the banking industry as a commercial banker and lending officer with national and international financial institutions. Based upon his experience, Ganter is familiar with the concept of "money laundering," including the transfer of funds through various bank accounts to conceal the origin of funds received from criminal and/or tortious activities.

20. On various dates from 1995 through 2000, Ganter met with Mr. Valentino at public bars or restaurants in Pennsylvania and New Jersey for the purpose of exchanging checks drawn upon Ganter's personal bank accounts in amounts less than the checks issued from the fraudulent Checking Accounts created and maintained by Mr. Valentino. Ganter did so in furtherance of an illegitimate agreement by and between Valentino and Ganter to misappropriate and convert [Sovereign's] funds and in order to aid and abet Valentino in the perpetration of the fraudulent scheme against [Sovereign] to misappropriate and convert [Sovereign's] monies for the mutual pecuniary gain of Valentino and Ganter.

21. On at least six (6) occasions, Valentino exchanged checks drawn upon the Checking Accounts with Ganter for a check drawn upon an account owned and maintained by Ganter and made payable to Valentino. The amount of each check exchanged by Ganter was less than that of the check Ganter received from Valentino.

\* \* \*

26. Ganter exchanged checks in order to aid and abet Valentino in the furtherance of his fraudulent scheme perpetrated against [Sovereign] to misappropriate and convert [Sovereign's] funds.

\* \* \*

72. Ganter actively, knowingly and intentionally facilitated Mr. Valentino's fraudulent scheme by knowingly exchanging funds for the proceeds of such scheme and depositing proceeds of such scheme into his person bank accounts.

In doing so, Ganter knowingly and substantially assisted Mr. Valentino in his scheme to defraud [Sovereign], as described above.

73. Ganter's intentional actions caused [Sovereign] to suffer pecuniary damages, as described above.

74. As a direct and proximate result of the actions of Ganter, [Sovereign] has suffered damages in an amount in excess of $1,800,000.00, including the expenditure of attorneys' fees and costs.

75. Ganter acted intentionally, willfully and wantonly so as to justify the imposition of punitive damages.

WHEREFORE, plaintiff, Sovereign Bank, demands judgment against defendant, Jeffrey J. Ganter, in the amount of $1,821,565.74, plus interest, punitive damages, attorneys' fees and costs of suit.

(Amended Complaint, filed 12/13/02, ¶¶ 10–15, 19–21, 26, 72–75; R.R. 123a–126a, 133a–134a). This language purports to raise a concerted tortious conduct claim. *See* Restatement (Second) of Torts § 876(b).

■■■ ¶ 22 At trial, Sovereign presented evidence regarding Mr. Valentino's misappropriation of funds. Mr. Valentino created loan accounts under fictitious names and deposited loan proceeds into the checking accounts bearing the same fictitious names. To further its concerted tortious conduct theory, Sovereign also introduced copies of checks exchanged between Mr. Ganter and Mr. Valentino between 1995 and 1997. Although Mr. Ganter testified he thought these checks were related to an investment club run by Mr. Valentino, the trial court did not find this testimony credible:

Ganter claimed that he was participating in an investment club with Valentino. He said that he believed the checks he was receiving were proceeds from stock sales.

However, Ganter was receiving checks drawn on accounts of individuals he did not know. He did not know the other members of the investment club. He never discussed the investment club with other alleged members. He did not know what investments were made. He never received a brokerage statement detailing the purchases. He could not explain why proceeds from the sale of investments were being paid out of an account of an individual he had never met. He could not explain why all of the proceeds were paid in his name even though Mr. Valentino was supposedly the one purchasing the investments. He presented no evidence that he ever invested a single dollar of his own money. He could not produce a tax return showing an investment gain or loss from his participation in an investment club. For these reasons, the [c]ourt believed that Ganter aided Valentino in his bank fraud.

(Trial Court Opinion at 3). We will not gainsay the trial court's determinations regarding the weight and credibility of Mr. Ganter's testimony. *See Turney Media Fuel, Inc., supra.* Considering the evidence in a light most favorable to Sovereign as the verdict winner, we conclude Sovereign presented sufficient, circumstantial evidence to demonstrate concerted tortious conduct on the part of Mr. Ganter. *See Baney, supra;* Restatement (Second) of Torts § 876.

¶ 23 Regarding damages, Sovereign presented copies of nine checks Mr. Ganter had received from Mr. Valentino, totaling $303,323.90. Mr. Ganter, however, testified he received ten checks from Mr. Valentino, totaling $328,256.90. (N.T. Trial, 7/26/04, at 118; R.R. at 1129a). Despite Mr. Ganter's testimony, the parties did not

present additional evidence of the alleged "tenth" check. Thus, the trial court calculated damages based upon the copies of the nine checks Sovereign admitted into evidence:

At trial [Sovereign] presented nine (9) checks that [Mr.] Valentino issued to [Mr.] Ganter totaling $303,323.90. Five (5) checks were given by [Mr.] Ganter to [Mr.] Valentino totaling $160,331.10. The difference or the amount retained by [Mr.] Ganter was $142,992.80, rounded by the [c]ourt to $143,000.00, and it was this sum that a verdict was entered in [Sovereign's] favor.

(Trial Court Opinion at 2). Thus, the trial court did not credit Mr. Ganter's testimony about the tenth check, and we will not disturb the court's credibility determination in this regard. *See Turney Media Fuel, Inc., supra.*

¶ 24 The court awarded damages based upon the "amount retained" by Mr. Ganter. Under Section 875, however, Mr. Ganter was a contributing tortfeasor and is liable to Sovereign for the entire harm caused by his tortious conduct, which Sovereign actually proved at trial. *See* Restatement (Second) of Torts § 875. Here, the harm Sovereign proved was the total amount of the nine checks Mr. Valentino gave Mr. Ganter, not just the amount Mr. Ganter personally retained as individual profit. Accordingly, we vacate the court's damage award, and remand the matter to the trial court for the entry of judgment in favor of Sovereign and against Mr. Ganter in the amount of $303,323.90.

¶ 25 In his appeal, docketed at No. 579 EDA 2005, Mr. Ganter raises the following issues for our review:

WAS THERE A PROFIT AS ALLEGED, OR AN INACCURATE PERCEPTION OF PROFIT BASED UPON MISINFORMATION AND AN INCOMPLETE REVIEW OF EVIDENCE? WHY IS THERE CONFUSION IN CALCULATING THIS "PROFIT," OR AWARD? DID THE [TRIAL] COURT CONSIDER ALL EVIDENCE PRESENTED UNDER THE SAME CRITERIA AND GUIDELINES, OR WAS CERTAIN EVIDENCE IMPROPERLY EXCLUDED IN CALCULATING AN AWARD AND WHY? DID [PLAINTIFF] INTRODUCE EVIDENCE POST–TRIAL, WHICH DISREGARDS LAW AND OPINION? DID [THE] TRIAL COURT REALIZE ITS ERROR OF EXCLUDING EVIDENCE....?

SHOULD [PLAINTIFF] HAVE BEEN PERMITTED TO INTRODUCE A CAUSE OF ACTION THAT [IT] NEVER SPECIFICALLY PLEADED? ARE THERE OTHER PROCEDURAL ISSUES WITH [PLAINTIFF'S] CASE THAT THE [TRIAL] COURT FAILED TO ADDRESS? DID [PLAINTIFF] PROVIDE CLEAR, CONCISE AND CONVINCING EVIDENCE TO SUPPORT THE ALLEGATIONS IN ACCORDANCE WITH ACCEPTED LAW AND COURT OPINION? SHOULD THE TRIAL COURT HAVE GRANTED [DEFENDANT'S] POST–TRIAL MOTIONS TO REVERSE ITS OPINION AND SUBSTANTIALLY LOWER AN EXCESSIVE AWARD?

SHOULD THIS ACTION HAVE BEEN BARRED BY THE STATUTE OF LIMITATIONS, [PLAINTIFF'S] NEGLIGENCE AND FAILURE TO MITIGATE DAMAGES, DEFECTIVE SERVICE, ETC. AND OTHER AFFIRMATIVE DEFENSES AS EVENTS OCCURRED EIGHT, NINE, AND ... MORE THAN TEN YEARS AGO?

(Mr. Ganter's Brief at 2).

¶ 26 Due to our resolution of Sovereign's issues on damages, we will address only

Mr. Ganter's third claim. Mr. Ganter alleges Sovereign's complaint was barred pursuant to Section 3118 of the Pennsylvania Commercial Code, which is the statute of limitations for claims involving negotiable instruments. Further, Mr. Ganter contends Sovereign could not recover damages on its claim, because Sections 3405 and 3406 of the Commercial Code preclude an entity from pursuing a conversion claim where the entity fails to exercise reasonable care to prevent embezzlement. Mr. Ganter concludes he is entitled to complete relief, because Sovereign failed to file its suit within the applicable statute of limitations. For the following reasons, we decline to address the merits of Mr. Ganter's claims.

¶ 27 Pennsylvania Rule of Civil Procedure 1030 provides, in pertinent part:

**Rule 1030. New Matter**

(a) Except as otherwise provided by subdivision (b), all affirmative defenses including but not limited to the defenses of accord and satisfaction, arbitration and award, consent, discharge in bankruptcy, duress, estoppel, failure of consideration, fair comment, fraud, illegality, immunity from suit, impossibility of performance, justification, laches, license, payment, privilege, release, *res judicata*, statute of frauds, statute of limitations, truth and waiver shall be pleaded in a responsive pleading under the heading "New Matter." A party may set forth as new matter any other material facts which are not merely denials of the averments of the preceding pleading.

(b) The affirmative defenses of assumption of the risk, comparative negligence and contributory negligence need not be pleaded.

Pa.R.C.P. 1030.

¶ 28 Additionally, "[i]f an issue has not been raised in a post-trial motion, it is waived for appeal purposes." *Diamond Reo Truck Co. v. Mid–Pacific Industries, Inc.*, 806 A.2d 423, 428 (Pa.Super.2002) (quoting *L.B. Foster Co. v. Lane Enterprises, Inc.*, 551 Pa. 307, 307, 710 A.2d 55, 55 (1998)). "Even when a litigant files post-trial motions but fails to raise a certain issue, that issue is deemed waived for purposes of appellate review." *Diamond Reo Truck Co., supra* at 428 (citing *Hall v. Owens Corning Fiberglass Corp.*, 779 A.2d 1167, 1169 (Pa.Super.2001)).

¶ 29 Instantly, Mr. Ganter filed an answer to Sovereign's complaint on January 16, 2003. Mr. Ganter did not plead the statute of limitations as an affirmative defense. On September 2, 2003, Mr. Ganter submitted new filings to the court styled as a new matter and motion to dismiss Sovereign's amended complaint. These filings did not raise Mr. Ganter's Commercial Code claims.[7] Finally, Mr. Ganter filed his post-trial motions on December 6,

---

7. On appeal, Mr. Ganter asserts he properly preserved these issues in his new matter and motion to dismiss. Specifically, Mr. Ganter's filing stated:

> [Sovereign's] failure to respond to discovery has caused undue delay and hardship to Ganter and has greatly hindered him in arguing various affirmative defenses including statute of limitations, [Sovereign's] negligence, [Sovereign] failed to mitigate damages, and determining and pursuing other legal grounds for dismissal and/or causes of action.

(New Matter and Motion to Dismiss, filed 9/2/03, at 3; R.R. at 402a). Mr. Ganter points to substantially similar language in his May 21, 2004 motion for hearing and sanctions. Mr. Ganter's assertions, however, are unavailing. When read in context, this language relates to Mr. Ganter's claims regarding Sovereign's alleged discovery violations, which differs from the allegations Mr. Ganter raises on appeal. Our review of the record indicates Mr. Ganter's Commercial Codes claims are raised for the first time on appeal.

2004. In his post-trial motions, Mr. Ganter did not raise these issues. Accordingly, the claims argued in Mr. Ganter's third issue are waived. *See Diamond Reo Truck Co.;* Pa. R.C.P. 1030.

¶ 30 Based upon the foregoing, we hold that concerted tortious action, as defined in Section 876 of the Restatement (Second) of Torts, is a recognized civil cause of action under Pennsylvania law. As such, the trial court erred when it did not enter judgment in favor of Sovereign and against Mr. Ganter in the amount of $303,323.90, which constitutes the full damages that Sovereign proved at trial. We further hold Mr. Ganter's issues relating to the statute of limitations and the Commercial Code are waived for purposes of appeal. Accordingly, we vacate the judgment and remand for the entry of a damage award consistent with this opinion.

¶ 31 Judgment vacated; case remanded with instructions. Jurisdiction is relinquished.